UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IGOR MALENKO, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  Docket no. 2:12-cv-49-GZS |
| | ) |
| STEPHANIE ANDERSON, as District | ) |
| Attorney for Cumberland County, | ) |
| | ) |
| Defendant. | ) |
| | ) |

ORDER ON MOTION TO DISMISS

Before the Court is Defendant's Motion to Dismiss (ECF No. 7) Plaintiff's Amended Complaint and Demand for Jury Trial ("Amended Complaint," ECF No. 5). As explained herein, the Court GRANTS Defendant's Motion.

I. LEGAL STANDARD

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)). In considering the merits of a motion to dismiss, the Court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in Plaintiff's favor. Gargano v. Liberty Intern. Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009). The Court must examine the factual content of the complaint and determine whether those facts support a reasonable inference "that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. 678. While "detailed factual allegations" are not necessary, Twombly, 550 U.S. at 555, the complaint must "contain sufficient factual matter … to state a claim to relief that is plausible on

its face." Iqbal, 556 U.S. 678 (quoting Twombly, 555 U.S. at 570) (internal quotations omitted). The complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010)); see also Iqbal, 556 U.S. at 678 (stating that the Court need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements").

## II.   FACTUAL BACKGROUND

Plaintiff Igor Malenko brings this case on behalf of himself and his minor child (referred to herein as "M.M.") against Defendant Cumberland County District Attorney Stephanie Anderson. Malenko alleges the following facts, which the Court accepts as true for the purposes of this Motion to Dismiss.

### A. The Contentious Custody Dispute

For the past four years, Malenko and his ex-wife, Lori Handrahan, have been engaged in a hotly disputed custody battle over M.M. Pursuant to a state court-issued custody order, dated February 1, 2011, Malenko is M.M.'s custodial parent. During the course of this custody dispute, Handrahan, who suffers from a personality disorder,[1] falsely accused Malenko of abusing their daughter. Attempting to prove that her allegations were true, Handrahan allegedly engaged in the following conduct: forcing M.M. to recite into a recording device false claims of abuse against Malenko; bringing M.M. to Maine Coast Memorial Hospital for unnecessary examinations in an effort to expose evidence of Malenko's abuse; and subjecting M.M. to at least

---

[1] Malenko asserts that Handrahan suffers from Narcissistic Personality Disorder.

eighteen separate drug tests at hospitals or clinics in an attempt to find evidence that Malenko was providing illicit drugs to M.M. Malenko also alleges that Handrahan repeatedly made false statements that Malenko sexually and physically assaulted M.M. and provided M.M. with illicit drugs. However, neither the Maine Department of Health and Human Services ("DHHS") nor any court have ever substantiated these claims. Handrahan has also contacted state and federal agencies claiming that Malenko is abusing M.M. Moreover, while Handrahan has filed several complaints for protection from abuse, each complaint has been dismissed. As a result of Handrahan's erratic behavior, M.M. has been dismissed from several day care facilities.

In April 2011, during M.M.'s weekend visitation with Handrahan, Handrahan took M.M. to Washington, D.C. and did not return M.M. to Malenko for eighteen days. Handrahan finally returned M.M. to Malenko after he contacted the FBI to report that M.M. was missing. As a result of Handrahan's behavior, in the spring of 2011 Malenko filed the following motions in state court: (1) a motion to modify parental rights, seeking to give Malenko sole rights and responsibilities over M.M.; (2) a complaint for protection from abuse on behalf of M.M., claiming that Handrahan was emotionally abusing M.M.; and (3) a motion for physical custody of M.M., following Handrahan's refusal to bring M.M. back from Washington, D.C.[2]

In response to Malenko's motion, the state court awarded Malenko authority "to make all final decisions regarding M.M." (See Amd. Compl. ¶ 9.) Since May 10, 2011, Malenko has exercised this authority to prohibit Handrahan from having any unsupervised contact with M.M. In fact, between May 10, 2011 and January 27, 2012, Handrahan had no contact whatsoever with her daughter. Meanwhile, beginning in November 2011, Handrahan began an internet campaign

---

[2] Malenko asserts that Handrahan has made numerous inflammatory and false statements against him, including that Malenko and his attorney have conspired with judges, DHHS officials, and others to take M.M. away from her in order to sell M.M. into a pedophile ring – what Handrahan calls a "kids for cash" scheme. Handrahan has also made statements that Malenko's attorney bribed judges and drafted opinions for a judge of the Maine District Court and a justice of the Maine Supreme Judicial Court.

which posted particularly personal information about M.M. on several websites, including M.M.'s date of birth, her medical records, her address, and explicit photographs of M.M. on an examination table at Maine Coast Memorial Hospital. Handrahan's website also stated that she would take M.M. out of the country if she ever got custody of M.M.[3] Malenko filed a motion in state court to remove this content from the internet.[4]

## B. The Events of January 27, 2012

On the morning of January 27, 2012, Malenko's current wife, Ms. Cvetkoska, took M.M. to daycare, where she had been enrolled since September 2011. Worried that Handrahan might jeopardize M.M.'s enrollment, Malenko never disclosed the name and location of M.M.'s daycare to Handrahan. Nevertheless, following their arrival at the daycare, as Cvetkoska and M.M. walked from the daycare parking lot to the building, Handrahan emerged from a car, ran towards Cvetkoska and M.M., and grabbed ahold of M.M. in an attempt to pull her away from Cvetkoska. M.M. resisted and clung to Cvetkoska's clothes while screaming that she did not want to go with Handrahan. Other parents with children at the daycare observed the spectacle and formed a semi-circle around Handrahan so that she could not leave with M.M. One parent called the police. Shortly thereafter, two police officers arrived from the Cape Elizabeth Police Department.

Prior to the officers' arrival, Handrahan succeeded in taking M.M. away from Cvetkoska and refused to release her. After arriving on the scene, the officers – Sgt. Andrew Steidl and Patrolman Aaron Webster – threatened to arrest Handrahan unless she released M.M. Handrahan complied and M.M. was taken into the daycare, which subsequently went into

---

[3] Malenko believed that Handrahan had obtained a passport for M.M., but had not turned the passport over to him as required by the custody order.

[4] Additionally, between March and September 2011, Handrahan ceased paying court ordered child support.

"lockdown" mode. At some point Malenko arrived, and he joined M.M. and Cvetkoska inside the daycare building. After shuttling between Handrahan in her car and Malenko in the daycare building, Sgt. Steindl determined that the dispute was a civil custody dispute rather than a criminal matter. Sgt. Steindl sent Handrahan on her way and Malenko and Cvetkoska left the daycare to file an assault complaint with the Cape Elizabeth Police Department. Later, Malenko and Cvetkoska also filed complaints in state court against Handrahan. Cvetkoska filed a complaint for protection from harassment and Malenko filed a complaint for protection from abuse on behalf of himself and M.M. The state court judge ruled on the motions at approximately 4:15 p.m. that afternoon, granting Cvetkoska a temporary protection from harassment order, but denying Malenko and M.M. temporary relief.

At approximately 1:35 p.m., following the episode at the daycare and presumably while Malenko and Cvetkoska were dealing with the legal issues discussed above, District Attorney Anderson called Sgt. Steindl regarding the incident with Handrahan at M.M.'s daycare.[5] Sgt. Steindl shared what he knew about the incident and noted that under his interpretation of the custody order governing custody of M.M. Malenko had the right to make all important decisions affecting M.M. Anderson questioned this conclusion and told Sgt. Steindl that she would "pull the court order and review it with the judge." (See Amd. Compl. ¶¶ 67-68.)

At approximately 2:39 p.m., Anderson called Sgt. Steindl and informed him that she had spoken with Judge Moskowitz, the judge who had issued the custody order. According to Anderson, Judge Moskowitz told her that Malenko had no control over visitation and that

---

[5] Malenko alleges that Anderson told Sgt. Steindl that she was returning a call from Chief Williams, presumably the Chief of Police for the Cape Elizabeth Police Department, although the Amended Complaint does not specify where Chief Williams is employed.

Handrahan had the legal right to see M.M. that weekend.[6] Anderson also told Sgt. Steindl "that M.M. can be turned over to Handrahan." (Id. ¶ 71.) Sgt. Steindl asked Anderson whether Judge Moskowitz had issued any new written orders in the case and Anderson replied that Judge Moskowitz had not issued any new written orders. Sgt. Steindl stated that he would drive to M.M.'s daycare to see if she was still there, and Anderson stated that she would contact Handrahan's attorney.

Sgt. Steindl then spoke with Chief Williams and subsequently with Lt. Cook of the South Portland Police Department ("SPPD") about the custody dispute. Lt. Cook informed Sgt. Steindl that SPPD knew about the custody dispute and was aware of allegations that Handrahan had posted explicit pictures of M.M. on the internet.

At approximately 4:30 p.m., Malenko and Cvetkoska returned to the daycare to retrieve M.M. When they arrived at the daycare they encountered several police cruisers and Sgt. Steindl, who informed Malenko that his conversations with Anderson had persuaded him that Malenko was required to turn M.M. over to Handrahan for weekend visitation.[7] Sgt. Steindl also told Malenko that he had to collect M.M. and turn her over to Handrahan because he had been instructed to do so by Anderson. Sgt. Steindl then spoke with Malenko's attorney over the telephone. Sgt. Steindl informed Malenko's attorney that he had spoken with Anderson, who told him that she had spoken with Judge Moskowitz and that Judge Moskowitz had indicated to her that the custody order should be followed and that Handrahan was entitled to weekend visitation with M.M.

---

[6] Malenko alleges that he was not given any notification about this conversation and was not invited to participate in the conversation.

[7] Malenko also alleges that Sgt. Steindl was "not comfortable" turning custody of M.M. over to Handrahan for weekend visitation. (See Amd. Compl. ¶ 78.)

Following the conversation with Malenko's attorney, Sgt. Steindl decided to delay turning M.M. over to Handrahan and instead called upon DHHS for assistance. Sgt. Steindl notified DHHS of the dispute and asked DHHS for advice on whether M.M. should go with Handrahan for weekend visitation. Malenko was not permitted to pick up M.M. from daycare; rather, Malenko waited approximately two hours for a DHHS official to make a decision concerning visitation. During the wait, Malenko worried that if M.M. were turned over to Handrahan he would never see M.M. again. At approximately 6:30 p.m., Sgt. Steindl informed Malenko that a DHHS official had informed him that M.M. should be returned to Malenko, "regardless of what DA Anderson stated." (See Amd. Compl. ¶ 96.) Malenko then retrieved M.M. from daycare, where she had been under the care of a teacher and the daycare owner.

## III. DISCUSSION

Malenko brings two claims against District Attorney Anderson. First, Malenko alleges that Anderson violated 42 U.S.C. § 1983 (Count I). Second, Malenko alleges that Anderson's conduct violated the Maine Civil Rights Act ("MCRA"), 5 M.R.S.A. § 4681, et seq.[8]

More specifically, Malenko alleges that Anderson violated § 1983 by acting under the color of state law to deprive him of his Fourteenth Amendment substantive and procedural due

---

[8] The Court need not discuss the MCRA claim as the Court's analysis of Count I applies equally to Count II. See Jackson v. Town of Waldoboro, 751 F. Supp. 2d 263, 275 (D. Me. 2010); Nillson-Borrill v. Burnheimer, 505 F. Supp. 2d 180, 183 (D. Me. 2007) ("courts routinely combine section 1983 analysis with MCRA analysis"); Forbis v. Portland, 270 F. Supp. 2d 57, 61 (D. Me. 2003) ("The disposition of the federal claim controls the plaintiff's claim under the Maine Civil Rights Act, 5 M.R.S.A. § 4682, because the latter is patterned on 42 U.S.C. § 1983."); Hegarty v. Somerset County, 848 F. Supp. 257, 269 (D. Me. 1994) ("The same qualified immunity analysis applies under the Maine Civil Rights Act as under § 1983."); Jennes v. Nickerson, 637 A.2d 1152, 1159 (Me. 1994) ("Having found the Officers immune from the section 1983 claims, we also find them immune from claims under the MCRA.").

process rights to a parent's care, custody, and control of his child.[9]  The Court first addresses whether Anderson is protected by absolute prosecutorial immunity, then considers Anderson's contention that she is entitled to qualified immunity, and finally turns to Anderson's argument that Malenko has failed to plead facts sufficient to state a claim under § 1983.

### A.  Absolute Immunity

Although the parties have not briefed the issue, the Court first addresses whether District Attorney Anderson is entitled to absolute immunity.  State prosecutors are entitled to absolute immunity when they engage in activities that are "intimately associated with the judicial phase of the criminal process."  Imbler v. Pachtman, 424 U.S. 409, 430 (1976); see also Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993).  Thus, absolute immunity protects prosecutors for actions taken in the initiation and pursuit of a criminal prosecution, as well as for actions during judicial proceedings.  See Buckley, 509 U.S. at 269 (citing Imbler, 424 U.S. at 430).  However, prosecutors do not enjoy absolute immunity when they perform administrative, investigative, or other functions – for example, when they give legal advice to the police.  See Van de Kamp v. Goldstein, 555 U.S. 335, 343 (2009); Burns v. Reed, 500 U.S. 478, 486, 491 (1991).  In determining whether particular actions of government officials are entitled to absolute immunity, the Court looks to the "nature of the function performed" rather than the identity of the actor who performed it.  Buckley, 509 U.S. at 269.  If the nature of the function requires legal knowledge

---

[9] Malenko also alleges that Anderson violated his right to: (1) family integrity under the Fourth Amendment; (2) freedom from unreasonable seizures under the Fourth Amendment; and (3) substantive and procedural due process under the Fourth and Fifth Amendments.  Malenko has not pursued these claims in his briefing, and the Court, as a preliminary matter, disposes of these unsubstantiated claims.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived") (internal citations omitted).  Furthermore, these unsubstantiated claims clearly have no merit.  First, in this case against the Cumberland County District Attorney, a state official, the family integrity claim is properly brought under the Fourteenth Amendment rather than the Fifth Amendment.  Second, Plaintiff has failed to plead any facts establishing that Anderson in any way participated in the seizure of M.M.  Third, Plaintiff's due process claims against Anderson are properly brought under the Fourteenth Amendment rather than the Fourth and Fifth Amendments.  Accordingly, the Court focuses on Malenko's claim that Anderson violated his Fourteenth Amendment substantive and procedural due process rights to parents' care, custody, and control of their children.  See Troxel v. Granville, 530 U.S. 57, 65 (2000).

and the related exercise of prosecutorial discretion, then absolute immunity is warranted. See Van de Camp, 555 U.S. at 343-44; Kalina v. Fletcher, 522 U.S. 118, 125-27 (1997). However, absolute immunity will be given "only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." Burns, 500 U.S. at 494.

Here, District Attorney Anderson's conduct did not involve the initiation or pursuit of a criminal prosecution, actions during judicial proceedings, nor the exercise of prosecutorial discretion. Rather, Anderson inserted herself into a custody dispute, conferred with Judge Moskowitz concerning the custody order he had issued, and pursuant to Judge Moskowitz's interpretation of the custody order recommended to Sgt. Steindl that he hand M.M. over to Handrahan for weekend visitation. Although Anderson's conduct is permitted by Maine law, see 19-A M.R.S.A. § 1775, it does not fall within the prosecutorial functions entitled to absolute immunity under the applicable Supreme Court case law.[10] Moreover, Anderson's conduct could be viewed as the provision of legal advice to Sgt. Steindl, a function that is not entitled to absolute immunity. Finally, recommending that M.M. be turned over to Handrahan was akin to making a custody determination (albeit a temporary one concerning visitation), which is a function of the courts, but not a prosecutor. See Suboh v. City of Revere, 141 F. Supp. 2d 124, 137 (D. Mass. 2001) (citing Robinson v. Via, 821 F.2d 913, 918-19 (2d Cir. 1987) (refusing to grant absolute immunity to prosecutor's participation in seizure of children from parental custody); Guzman-Rivera v. Rivera-Cruz, 55 F.3d 26, 29 (1st Cir. 1995)); see also Benavidez v. Gunnell, 722 F.2d 615 (10th Cir. 1983) (denying absolute immunity to prosecutor who provided legal advice to officers during custody dispute). Consequently, Anderson is not entitled to absolute immunity.

---

[10] Under 19-A M.R.S.A. § 1775, prosecutors may "take any lawful action … to … enforce a child custody determination if there is … [a]n existing child custody determination."

## B. Qualified Immunity

Anderson asserts that she is entitled to qualified immunity. Qualified immunity is not a mere defense to liability; it is an affirmative defense that provides public officials immunity from suit. See Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Accordingly, "immunity is to be resolved at the earliest possible stage in litigation," including the motion to dismiss stage. Haley, 657 F.3d at 47 (internal citations omitted). Early resolution of immunity "ensures that insubstantial claims against government officials will be resolved before discovery." Maldonado, 568 F.3d at 268 (citing Anderson v. Creighton, 483 U.S. 635, 640, n.2 (1987)). "Indeed, [t]he basic thrust of the qualified immunity doctrine is to free officials from the concerns of litigation, including avoidance of disruptive discovery." Id. (quoting Iqbal, 556 U.S. at 685) (internal quotation omitted).

The Court uses a three-part test to determine whether an official is entitled to qualified immunity.[11] The Court must decide: (1) whether the facts that a plaintiff has alleged establish a constitutional violation; (2) whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct; and (3) "whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." DeMayo v. Nugent, 517 F.3d 11, 17 (1st Cir. 2008); see also Haley, 657 F.3d at 47.

In the interest of judicial efficiency, the Court proceeds directly to the second prong, which asks whether the constitutional rights at issue were clearly established at the time of

---

[11] Defendants bear the burden of proving immunity. Logiodice v. Trustees of Maine Cent. Institute, 135 F. Supp. 2d 199, 206 (D. Me. 2001) (citing DiMarco–Zappa v. Cabanillas, 238 F.3d 25, 35 (1st Cir. 2001)).

Anderson's alleged misconduct.[12]  See Haley, 657 F.3d at 47.  For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson, 483 U.S. at 640; Haley, 657 F.3d at 47.  In conducting this analysis, the Court considers whether existing case law gave the defendant "fair warning that [her] conduct violated the plaintiff's constitutional rights."  DeMayo, 517 F.3d at 17 (internal citations and quotation omitted).  This inquiry requires that the Court examine the specific factual context in question to see whether the law was sufficiently clear to place the official on notice that at the time of the incident her conduct violated plaintiff's constitutional rights.  See id.

Malenko contends that the contours of the rights at issue in this case were clearly established in Suboh v. District Attorney's Office of the Suffolk District. Specifically, Malenko asserts that Suboh clearly established that under the Due Process Clause of the Fourteenth Amendment parents have a liberty interest in the care, custody, and control of their children, and, absent abuse or imminent danger, the state may not interfere with that interest without due process of law.  298 F.3d at 92; see also Hatch v. Dep't for Children, Youth and Their Families, 274 F.3d 12, 20-21 (1st Cir. 2001); see also Troxel v. Granville, 530 U.S. 57, 65 (2000).  Malenko further asserts that Anderson violated his clearly established constitutional rights when she inserted herself into the visitation dispute and instructed Sgt. Steindl that Handrahan was entitled to weekend visitation with M.M., which allegedly caused Sgt. Steindl to request the

---

[12] The Court also believes that Plaintiff fails to satisfy the first prong of the qualified immunity analysis – the constitutional violation prong.  Specifically, the Court concludes that the two-hour custodial interruption did not violate Malenko's due process rights because Sgt. Steindl separated Malenko from M.M. based on Steindl's belief that Handrahan had a right to visitation pursuant to the custody order and because he reasonably believed that turning M.M. over to Handrahan would place M.M. in imminent danger.  Indeed, the state may temporarily terminate a parent's right to care, custody, and control where the child has been abused or where the child is in imminent danger.  See Suboh v. Dist. Attorney's Office of the Suffolk Dist., 298 F.3d 81, 92 (1st Cir. 2002); Hatch v. Dep't for Children, Youth and Their Families, 274 F.3d 12, 20-21 (1st Cir. 2001).

11

assistance of DHHS and separate Malenko from M.M. for approximately two hours while a DHHS official determined whether Handrahan should have weekend visitation.

However, Malenko is misplaced in arguing that Anderson violated constitutional rights clearly established by Suboh, because the rights at issue in Suboh differ meaningfully from the rights at issue in this case. First, Suboh involved the permanent deprivation of parental care, custody, and control associated with a custody determination, while this case centers on a two-hour custodial interruption. See Brittain v. Hansen, 451 F.3d 982, 989 (9th Cir. 2009) (distinguishing the constitutional interest in permanent custody from the constitutional interest in a single visitation period) (citing Zakrzewski v. Fox, 87 F.3d 1011, 1013-14 (8th Cir. 1996); Wise v. Bravo, 666 F.2d 1328, 1332-33 (10th Cir. 1981)). Unlike Plaintiff in this case, the plaintiff in Suboh alleged that the defendant state actors – an assistant district attorney and a police officer – had violated her constitutional rights by permanently terminating her right to the custody of her daughter without following any procedural protections. Here, in contrast, the alleged constitutional deprivation did not involve the permanent termination of custody; rather, the allegations concern a two-hour custodial interruption, a significantly lesser interest than permanent custody.[13] Cf. Brittain, 451 F.3d at 992-93 ("a relatively minor infringement on this liberty interest in visitation will not give rise to a Section 1983 substantive due process claim") (internal citations omitted). As the Supreme Court has stated, "persons faced with forced

---

[13] What the Ninth Circuit said in Brittain concerning visitation rights is applicable to the two-hour temporary custodial interruption in this case:

> If any deprivation of visitation rights, no matter how slight, can give rise to a substantive due process claim, litigants will not only be able to use substantive due process as a "font of tort law," but also as a tool to transform federal courts into family courts…. If every custody dispute, including ones concerning a weekend or even an hour of visitation, can give rise to a federal claim necessitating federal interpretation of a state custody order, federal courts could rapidly become *de facto* family courts. Such a result is not permitted by Supreme Court jurisprudence.

Brittain, 451 F.3d at 995.

dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs." Santosky v. Kramer, 455 U.S. 745, 753 (1982). This case involves state officials intervening in ongoing family affairs and not, as in Suboh, the ultimate resolution or "forced dissolution" of parental custody.

Second, while the state actors in Suboh made a permanent custody determination without the benefit – or even the existence – of a custody order, the conduct underlying this case was predicated upon an existing custody order and the interpretation of that order. Notably, the liberty interest in parental care, custody, and control can be significantly reduced by the terms of a custody order. See Brittain, 451 F.3d at 992 (citing Zakrzewski, 87 F.3d at 1013-14). Here, Plaintiff's claims fail to give effect to the custody order – issued by the state court – which provided Handrahan with visitation rights. Although the state court proceedings predating the events at issue in this case awarded custody to Malenko, his custody rights were subject to Handrahan's visitation rights, which reduce Malenko's liberty interest in parental care, custody, and control. Cf. Brittain, 451 F.3d at 989.

In addition, Malenko has proffered no case that holds directly, or that may be fairly read to suggest, that a district attorney violates a custodial father's right to the care, custody, and control of his child when the district attorney reasonably interprets a custody order as providing the mother with weekend visitation.[14] Accordingly, the Court finds that the state of the law at the time of Anderson's actions failed to provide her "fair warning" that her alleged treatment of Malenko was unconstitutional. See Suboh, 298 F.3d at 94 (citing Hope, 536 U.S. at 740-41). The Court therefore concludes that the contours of the constitutional rights invoked by Malenko were not sufficiently clear that a reasonable official inserting herself in a visitation dispute as Anderson did would understand that what she was doing violated Malenko's constitutional

---

[14] Malenko makes no allegation that Anderson's interpretation of the custody order was unreasonable.

13

rights. The Court's conclusion decides the question of qualified immunity in favor of Anderson; nonetheless, the Court proceeds to the third and final prong of the qualified immunity test and holds that Anderson is entitled to qualified immunity under that prong as well.

The third prong of the qualified immunity test asks whether it would have been clear to an objectively reasonable official, situated similarly to Anderson, that Anderson's actions contravened a clearly established right. See DeMayo, 517 F.3d at 17. In answering this question, the Court recognizes that even if Anderson's conduct was a mistake, she is entitled to qualified immunity unless a reasonable state official, situated similarly to Anderson and knowing what Anderson knew, would have recognized that her conduct violated Malenko's federal constitutional right to parental care, custody, and control. See Hatch, 274 F.3d at 24 (citing Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999)).

After careful consideration, the Court concludes that Anderson's conduct was objectively reasonable. First, Maine law specifically authorizes prosecutors to "take any lawful action … to … enforce a child custody determination…." 19-A M.R.S.A. § 1775. The fact that Anderson was following Maine law by intervening in the visitation dispute supports the conclusion that her conduct was objectively reasonable.[15] Second, in seeking to resolve the visitation dispute Anderson consulted with Judge Moskowitz – the judge who issued the custody order – about the meaning of the order and how it applied to the instant dispute. Judge Moskowitz informed Anderson that Malenko had no control over visitation and that Handrahan had the right to see M.M. that weekend. (See Amd. Compl. ¶ 70.) Further, the Amended Complaint contains no allegation that Anderson misread or misinterpreted the custody order. Rather, Anderson sought

---

[15] Furthermore, Maine law provides that prosecutors and law enforcement officers may coordinate their activities in connection with enforcing custody determinations. See 19-A M.R.S.A. § 1776 ("At the request of a prosecutor acting under section 1775, a law enforcement officer may take any lawful action reasonably necessary to … assist a prosecutor with responsibilities under section 1775.").

the advice of Judge Moskowitz and advised Sgt. Steindl according to Judge Moskowitz's interpretation of the custody order. Anderson's actions in consulting with the judge who had issued the operative custody order, obtaining his advice, and forwarding his advice to Sgt. Steindl also support the conclusion that Anderson's conduct was objectively reasonable. Cf. Messerschmidt v. Millender, --- U.S. ---, 132 S.Ct. 1235, 1249 (2012) (granting qualified immunity to police officer who drafted search warrant application and conducted search pursuant to unconstitutionally overbroad warrant in part because officer was not objectively unreasonable in executing warrant after it was approved by deputy district attorney and issued by magistrate). Accordingly, the Court finds that an objectively reasonable official similarly situated to Anderson would not have seen Anderson's involvement and advice as contravening Malenko's clearly established right to parental care, custody, and control. Consequently, Anderson is entitled to qualified immunity based on the third prong of the qualified immunity test.

### C. Failure to State a Claim

Anderson also contends that Malenko has failed to allege facts sufficient to state a claim under 42 U.S.C. § 1983. To succeed on a claim under § 1983, Anderson must show that (1) the conduct complained of was committed by a person acting under the color of state law, and (2) that this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. See Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 559 (1st Cir. 1989). In connection with the second inquiry, "the conduct complained of must have been causally connected to the deprivation." Id.; see also Constable v. California, No. 1:07-cv-995-OWW-SMS, 2007 WL 3151887, at *3 (E.D. Cal. Oct. 26, 2007) ("The statute plainly requires that there be an actual connection or link between the actions of the defendants and the

deprivation alleged to have been suffered by plaintiff.") (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)); Rizzo v. Goode, 423 U.S. 362 (1976)).

Even assuming that Anderson was not entitled to qualified immunity, Malenko's Amended Complaint fails to state a claim because Anderson's directive to Sgt. Steindl that he turn M.M. over to Handrahan for weekend visitation did not cause the alleged deprivation of parental care, custody, and control. Section 1983 imposes liability upon those who cause any citizen to be subjected to a deprivation of his or her constitutional rights. See Gutierrez-Rodriguez, 882 F.2d at 560-61. "The requisite causal connection can be established … by some kind of direct personal participation in the deprivation" and "by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Id. at 561 (quoting Springer v. Seaman, 821 F.2d 879, 879 (1st Cir. 1987)). Inquiries into causation under § 1983 are governed by common law tort principles. Id. (citing Springer, 821 F.2d at 876-79; Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 305-06 (1986)).

Quite simply, the Court finds that there was no causal connection between Anderson's actions and Malenko's temporary custodial interruption.[16] In this case, it was not foreseeable that Anderson telling Sgt. Steindl that M.M. could be turned over to Handrahan for weekend visitation would result in Malenko's two-hour custodial interruption. While it may have been foreseeable that Anderson's conversations with Sgt. Steindl would result in Sgt. Steindl turning M.M. over to Handrahan, that is not what occurred. Rather, following his conversations with

---

[16] Causation, of course, is comprised of causation in fact and proximate (or "legal") causation. See Peckham v. Continental Cas. Ins. Co., 895 F.2d 830, 836 (1st Cir. 1990) (citing Restatement (Second) of Torts § 432(1) (1965)). The inquiry into proximate cause is independent of the inquiry into actual cause. The key is foreseeability: conduct results in liability if, and to the extent that, a foreseeable risk of harm materializes. See id. While causation is usually a question for a jury, the Court may make a finding with regard to causation when, assuming the plaintiff's allegations are true, and viewing them in the light most favorable to the plaintiff, a thoughtful factfinder could reach but one reasoned conclusion. See id.

Anderson, Sgt. Steindl spoke with Malenko's attorney and informed him that Anderson had contacted Judge Moskowitz and that Judge Moskowitz had indicated that the custody order should be followed and M.M. turned over to Handrahan for weekend visitation. Following his conversation, rather than turning M.M. over to Handrahan, Sgt. Steindl notified DHHS of the situation and asked DHHS to decide the best course of action. This was not a foreseeable result of Anderson's conversation with Sgt. Steindl. Further, it was not foreseeable that Anderson's conversation would result in M.M. being separated from her father for two hours while Sgt. Steindl waited for DHHS to decide whether M.M. should be allowed to visit with her mother over the weekend. Accordingly, a reasonable factfinder could only reach one conclusion: that Plaintiff's alleged constitutional deprivation was not the foreseeable result of Anderson's conduct. As a result, the Court alternatively finds that Plaintiff has failed to state a claim under § 1983 upon which relief could be granted.

## IV. CONCLUSION

For the reasons stated herein, the Court ORDERS that Defendant's Motion to Dismiss (ECF No. 7) is GRANTED.

SO ORDERED.

                                               /s/ George Z. Singal
                                               United States District Judge

Dated this 23rd day of May, 2012.